IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 11, 2017 Session

## STATE OF TENNESSEE v. WALTER COLLINS

**Appeal from the Criminal Court for Shelby County**
No. 15-00211      Paula Skahan, Judge

_____

### No. W2016-01819-CCA-R3-CD
_____

The Shelby County Grand Jury charged the Defendant-Appellant, Walter Collins, and two codefendants with first degree felony murder. Following a jury trial, Collins, who was seventeen years old at the time of the offense, was convicted as charged and sentenced to life imprisonment. On appeal, Collins argues: (1) the trial court erred in denying his motion to suppress his statement to police; (2) the trial court erred in admitting certain evidence at trial; (3) the evidence is insufficient to sustain his conviction; and (4) his sentence of life imprisonment violates the prohibition against cruel and unusual punishment in the United States and Tennessee Constitutions, and the trial court abused its discretion in failing to dismiss his indictment on that basis.[1] We affirm the judgment of the trial court.

**Tenn. R App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Stephen C. Bush, District Public Defender; and Barry W. Kuhn (on appeal), and Jennifer Case and Amy G. Mayne (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Walter Collins.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Pamela Stark and Samuel Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

---

[1] We have reordered the issues on appeal for clarity.

This case relates to the March 9, 2014 shooting death and robbery of the victim, Larry Wilkins. Collins and two codefendants arranged to purchase a Mustang the victim had listed on Craigslist and, after test driving this car, robbed the victim of his automobile and shot him.

**Suppression Hearing.** At the hearing on Collins' motion to suppress his statement to police, Sergeant Kevin Lundy with the Memphis Police Department testified that he investigated the death of the victim. He said that several witnesses at the scene had provided information to the police. Corrie O'Bryant informed officers that she had seen three men standing around the open hood of a Ford Mustang and, a minute later, heard five gunshots. Lekevva Allen told police that after hearing four or five gunshots, she looked out her bedroom window and saw two men running away and saw the Mustang speeding off toward the exit. Joanna Martin informed police that she saw two men running from the scene.

Sergeant Lundy said a car belonging to Collins' brother, codefendant Brandon Vance, was left at the scene of the crime. After obtaining a warrant, the police searched this car on March 10, 2014, and discovered Vance's Tennessee identification, a tow ticket for Vance's car, and Vance's driver's license application. In addition, some Southwest Community College financial paperwork containing Collins' name and social security number and a juvenile summons for a traffic ticket made out to Collins were found inside Vance's car. Sergeant Lundy acknowledged that he was unsure whether the financial paperwork actually belonged to Collins.

On March 11, 2014, Sergeant Lundy took statements from Vance and Martiness Henderson, the other codefendant. Vance told police that he, Henderson, and Collins planned to steal a car the victim had listed on Craigslist and that during this offense, Vance's car was left at the scene. Vance's statement corroborated not only the statements from witnesses at the scene but also the paperwork related to Collins that was found in Vance's car at the scene. Henderson, who was a juvenile, had his mother present during his interview and told the officers that he, Vance, and Collins planned to rob the victim of the Mustang that had been listed on Craigslist.

Sergeant Lundy said that around 9:00 a.m. on March 12, 2014, Collins was brought to the homicide office and subsequently gave a statement to police at 9:58 a.m. Because Collins was a juvenile, his mother was present when he was advised of his Miranda rights and when he signed the Advice of Rights form prior to giving his oral and written statements to police. Sergeant Lundy said Collins' statement contained a notation, "He read aloud," which meant that Collins read the Advice of Rights form aloud in the presence of his mother and the police. Sergeant Lundy said Collins appeared to understand the Advice of Rights form and did not appear to have any learning

- 2 -

disabilities.  He added that Collins' mother never indicated that Collins had been enrolled in any special education classes or had any educational impairments that prevented him from knowingly waiving his rights or giving a statement.

After Collins read this form aloud, Collins and his mother signed the Advice of Rights form before Collins gave his statement.  Collins told the police that he, Vance, and Henderson rode to the scene in Vance's car, hid in a corner, and when the victim came out, they approached him, and shots were fired.  Collins jumped into the Mustang because he was the only one who knew how to drive a standard transmission and then drove to his sister's home.  Collins added that because Vance's car would not crank, Vance and Henderson ran away from the scene.  Collins said that they had walkie-talkies, and a single walkie-talkie was found at the scene.  Collins' statement corroborated the other evidence obtained by the police regarding this offense.

Sergeant Lundy acknowledged that while fingerprints belonging to Vance and Henderson were found on the victim's Mustang, Collins' fingerprints were not found on this car.  He said that until Vance's and Henderson's interviews, no one had told the police that Collins was involved in the offense.  However, after Vance and Henderson implicated Collins in the crime, Collins was arrested without a warrant sometime prior to 9:00 a.m. on March 12, 2014.  Collins was then brought to the homicide office, despite the fact that he had not been charged with any crime.  Sergeant Lundy confirmed that the reason Collins had been brought to the homicide office was to determine his "involvement in this particular incident."

Sergeant Lundy first encountered Collins, who had been shackled or handcuffed, in one of the interview rooms at the homicide office.  Although Sergeant Lundy said that juveniles are typically given an opportunity to talk to a parent or guardian before their interview, he could not say whether this procedure was followed in Collins' case.  He conceded that while Collins was in the interview room, he was not free to leave.  He confirmed that no video or audio recording had been made of Collins' interview.

Sergeant Lundy said he did not ask Collins to explain, in his own words, what the Advice of Rights form meant because that was not his normal procedure.  He acknowledged that he did not ask Collins if he understood what a lawyer was and did not tell Collins what the consequences of his appearing in court might be.  He stated that Sergeant Kelly was also present during Collins' interview and that although Sergeant Wilkie was not in the room during Collins' questioning, he was present when Collins' written statement was typed.  Sergeant Lundy confirmed he was the officer who actually took Collins' statement.

Sergeant Lundy said that neither Collins nor Collins' mother had any questions about the Advice of Rights form during the interview. He stated that if a suspect asked questions about the meaning of words on the Advice of Rights form, then he explained the meaning of these words before continuing with the interview.

Sergeant Lundy said that unlike Vance, Collins never provided any evidence of an alibi and that if Collins had given an alibi, the police would have investigated it before continuing with Collins' statement. During the interview, Collins gave his address as 3730 Fieldbrook Street, Memphis, which was two blocks away from Annie's Apartments, which was where the Mustang was found by police. In response to the questions, "Do you understand each of these rights I've explained to you?" and "Having been read these rights, do you wish to talk to us now?," Collins specifically wrote "Yes" on the Advice of Rights form and the written statement and signed his initials. Sergeant Lundy said Collins was given an opportunity to make any changes to his written statement prior to signing and initialing it.

Sergeant Lundy acknowledged that the police records regarding the interview did not reflect whether Collins was offered food, drink, or bathroom breaks during his time in the homicide bureau. While he did not recall Collins asking for any of these things, he said that if Collins had asked for them, then they would have been provided. When Sergeant Lundy left Collins' presence in the interview room, Collins had not been charged with any particular crime. He added that the case officer, Sergeant Hurst, was responsible for contacting the district attorney's office to determine whether Collins would be charged as a juvenile or an adult and that this determination was made before a charging decision could be made.

Sergeant Lundy acknowledged that he never took Collins to appear before a judicial commissioner or magistrate prior to being taken to juvenile detention. He said he never saw a magistrate advise Collins that he was being charged with a crime, inform him of his rights, or tell him that there was probable cause to detain him. Sergeant Lundy admitted that he did not know whether Collins was ever taken before a magistrate after his arrest on March 12, 2014.

Dr. James Walker, an expert in the fields of forensic psychology and neuropsychology, testified that he performed a comprehensive neuropsychological evaluation of Collins. He said Collins had a full scale intelligence quotient (IQ) of 82, which was in the low average range and meant that Collins' "reasoning and thinking abilities [were] not as well developed as, perhaps, the average person in our society." He also said Collins' verbal IQ score was 72, which indicated that he "had significant problems understanding and dealing with language." Dr. Walker opined that Collins' test scores showed that he functioned on a fifth grade level and that he would be able to use

his language skills as effectively as only the lowest three people out of a hundred. However, Dr. Walker acknowledged that Collins scored an 88 on perceptual reasoning, which placed him on the higher end of low average and indicated that he performed better on non-verbal skills.

Dr. Walker concluded that Collins' scores on two different tests showed that he was "a very compliant, highly suggestible person." He said Collins was "extremely susceptible to someone suggesting he should change his answer" and that Collins "would typically do what other people want[ed] him to do rather than what he chooses to do." Relevant to this issue, Dr. Walker noted that Collins said his mother told him to talk to the police officers about this case. Dr. Walker diagnosed Collins with depressive disorder and a dependent personality disorder, which contributed to his being very dependent on others and doing what others wanted him to do.

Dr. Walker also opined that Collins would be unlikely to understand the rights described in the Advice of Rights form or the consequences of waiving these rights and would have signed the waiver in order to comply with the wishes of the police and his mother. Dr. Walker said that Collins told him it never occurred to him not to talk to the police during his interview.

Dr. Walker admitted that Collins did not have any brain injuries or disorders that would have entitled him to full social security disability benefits. He said Collins could do simple tasks but would be unable to complete complex tasks involving multiple steps. Dr. Walker acknowledged that Collins, at age 15, began working as a cook at Krystal's and performed so well in that job that his supervisor asked him to fill in at the drive-through window and the cash register without any specific training. However, he asserted that it would take Collins longer than the average employee to learn these tasks.

Dr. Walker said his testimony was not that Collins was unable to understand the Miranda warnings. He acknowledged that if Collins had received prior exposure to the Miranda rights, then it would be easier for him to understand these rights than if he had never been exposed to these rights. He also acknowledged that if people in Collins' family or peer group had been involved in interactions with the police, then this would affect Collins' knowledge as to how to conduct himself around police.

Dr. Walker said Collins disclosed that he had "great difficulty navigating his relationship with his mother" because "she was a very strong-willed person." He acknowledged that Collins' desire to please others could have motivated him to provide certain information to him and his defense attorneys in order to help his case.

Dr. Walker stated that he was not surprised to learn that Collins told people during phone conversations in jail that he could not talk to them about the crime because the call was being recorded. He said the difference between the phone situation and the interview situation was that Collins' decision to talk to the police "was a forgone conclusion given his personality characteristics." Dr. Walker was not surprised to learn that Collins had gone to Mississippi to look for an engine for his own vehicle immediately after the victim's death. He explained that "[p]eople do all kinds of things after they do bad things[.]"

Dr. Walker said he was surprised to learn that Collins' codefendants claimed Collins was the one who found the Craigslist advertisement and who wanted to steal the car. He also said he was surprised to discover that the codefendants claimed Collins used a masking application to disguise his cell phone number when sending texts to the victim about the Mustang. Dr. Walker acknowledged that Collins said he provided the gun used to kill the victim.

**Trial.** Dionne Lee testified that on the afternoon of March 9, 2014, she and her boyfriend, the victim, finished their shifts at FedEx and returned to their apartment in Memphis. Lee decided to take a nap, and she asked the victim to wake her up at 8:00 p.m. When she awoke on her own around 8:00 p.m., she noticed that the victim was asleep on the couch, and she returned to sleep. Sometime between 11:30 p.m. and midnight, Lee was awakened by the sound of five or six gunshots fired nearby. When she was unable to find the victim inside the apartment, she went outside. She saw some people standing around who appeared to be "in shock a little," and one of these individuals told her that "the guy in the Mustang shot that guy" and pointed in the direction of her apartment building. When Lee turned around, she saw the victim lying in the parking lot where his Mustang had been parked. She immediately ran to him and realized that he was dead.

When the police arrived at the scene, Lee gave them the victim's cell phone, which had been on the ground next to the victim's body. Lee said the victim had been trying to sell his Mustang so he could buy a Camaro, and the victim's phone contained some text messages and phone calls between the victim and another person regarding the Mustang. One text message in particular had been sent at 11:00 p.m. that night. As Lee looked around the parking lot, she noticed a Monte Carlo, that she had never seen before, that was backed into a space in the parking lot.

Corrie O'Bryant testified that she and her boyfriend, Frederick Moss, were coming home around midnight on March 9, 2014, when she saw three or four men under the open hood of a Mustang at her apartment complex. She parked her vehicle, and thirty to forty-five seconds later, she heard gunshots. She went inside her apartment for five minutes

before walking back outside to find out what had happened. When she got to the parking lot, she noticed the victim lying on the ground and heard a lady start screaming, "They killed him." She also realized that the Mustang she had seen was missing.

Fredrick Moss also testified that he saw four or five men gathered around the open hood of a Mustang. He said that as he and O'Bryant were getting out of the car, he heard four or five gunshots.

Lekevva Allen testified that she was studying in her apartment around midnight on May 9, 2014, when she heard five gunshots. She immediately ran to her back bedroom, which was the direction from which the shots were fired. When she looked out her window there, she saw two or three men gathered together. Allen ran back to the front of the apartment to determine if her boyfriend heard the shots, and then less than a minute later, returned to the back bedroom window. As she looked out, she saw one man fall down, two other men run away, and observed the Mustang pulling out of the parking lot. Allen said she was unable to see who got into the Mustang before it left the apartment complex.

Officer Michael Huff testified that when he arrived at the crime scene, he saw the deceased victim and several people gathered together. He and other officers noticed that the victim's Mustang was missing from the parking lot and that a Monte Carlo was parked in one of the spaces. The Monte Carlo stood out because its windows were rolled down, which was unusual because the weather at the time was chilly. In addition, the other cars in the lot had their windows rolled up and were locked, probably because there had been several car thefts at that apartment complex. Officer Huff said he put up crime scene tape to secure the area and began separating the witnesses so statements could be obtained.

Officer James Smith testified that he collected four spent shell casings at the scene. He said three of the casings were .380 caliber and one casing was nine millimeter.

Sergeant Reginald Titus testified that he suspected that the Monte Carlo belonged to the person who killed the victim, and he and other officers kept the car under surveillance all night with the hope that the suspect would return to claim it. Sergeant Titus identified a photograph of the Monte Carlo that had a temporary tag placed in the window.

Sergeant James Sewell testified that after obtaining a search warrant, he discovered numerous items inside the Monte Carlo. He found an identification, an application for a driver's license, and an employment application that contained Vance's name. He also found a temporary tag listing Vance's name and an address of 3730

Fieldbrook Street, Memphis. In addition, he found a juvenile summons issued to Collins for a traffic ticket that contained an address of 3730 Fieldbrook Street, Memphis and another document that referenced Collins' name inside Vance's vehicle. In the backseat of the Monte Carlo, Sergeant Sewell found a magazine advertising cars for sale and a walkie-talkie that was powered on and functioning. He admitted that although he found approximately twenty items that belonged to Vance inside the car, he found only two items that belonged to Collins.

Officer James Johnson testified that on March 10, 2014, around 10:00 a.m., he saw what appeared to be the victim's Mustang but lost track of it when it turned into the entrance for Annie's Apartments, which was near the address of 3730 Fieldbrook Street, Memphis. He later located the Mustang, which was parked with the doors partially open and the keys inside, in the apartment complex.

Sergeant Kelly stated that sometime before 9:00 a.m. on March 12, 2014, Collins was arrested without a warrant and placed in handcuffs. Although the police had probable cause to arrest Collins, he was not charged with any particular crime at the time of his arrest. Collins was then taken to the homicide office by a patrol officer and while Collins' mother was not permitted to ride in the police car with him, she arrived shortly after Collins reached the police station.

Collins got to the homicide office around 9:00 a.m. and was shackled and placed in an interview room with two other officers until his mother arrived. Sergeant Kelly said that at the beginning of the interview, he introduced himself and Sergeant Lundy as homicide investigators with the Memphis Police Department. Sergeant Kelly allowed Collins' mother to sit down and asked Collins if he needed to use the restroom. Collins was allowed to speak with his mother. Sergeant Kelly advised Collins of his Miranda rights and at 9:22 a.m. presented him with the Advice of Rights form. He acknowledged that he did not ask Collins to explain what Advice of Rights form meant in his own words but asserted that Collins did not have any questions about his rights and stated that he understood his rights. Sergeant Kelly then told Collins that he would not be coerced into giving a statement, and when Collins indicated that he did not understand what that meant, Sergeant Kelly explained that "coercion" meant that no one was "going to come in here and beat [him] or kick [him] or punch [him] or threaten to lock up [his] mama if [he] [did]n't talk to [the police]." Collins' mother was able to ask any questions that she had at the time. Sergeant Kelly said that both Collins and his mother appeared to understand the Miranda rights before both Collins and his mother signed and initialed the Advice of Rights form in his presence.

Sergeant Kelley said that he and Sergeant Lundy, who were both dressed in suits, talked to Collins about why he was there that day. During the interview, Collins stated

that his home address was 3730 Fieldbrook Street, Memphis. Collins explained that he, Vance, and Henderson found the listing for the Mustang on Craigslist and planned to steal it. Collins used his stepfather's cell phone and an application called Text Free, which provided a false number, to contact the victim before driving to the victim's apartment in Vance's Monte Carlo. He said that although his stepfather's phone did not have cellular service, they were able to use his stepfather's phone with his sister's Wi-Fi. When they left his sister's home to enact the plan, they used a different cell phone that had cellular service but were able to use the same false number they had created with the Text Free application. Collins said they dropped off Henderson ahead of time at the victim's apartment complex. The plan was to have Henderson hide while he and Vance looked at the Mustang and then have Henderson appear with a gun and steal the keys to the victim's car. Collins admitted that he provided the gun, a .380 caliber pistol, that Henderson used to shoot the victim. He said that because they only had one walkie-talkie, they did not use it during the commission of the offense.

Sergeant Kelly said Collins asserted that he and Vance test drove the car and when they returned, Henderson came around the side of the apartments and fired six shots at the victim. Then, Collins, Vance, and Henderson tried to leave the scene in Vance's Monte Carlo, but it would not crank, so Collins, who was the only one of the three of them who could drive a standard transmission, and Henderson got into the Mustang and left the scene as Vance ran away. Collins and Henderson took the Mustang to the Annie's Apartments in Frayser and then walked to Henderson's home, which was nearby. The next morning, Collins and Henderson returned to the apartments so Henderson could learn to drive the Mustang, and they encountered a police officer, who pulled in after them into the complex. Collins stated that he was sorry for his actions and regretted what had happened. Sergeant Kelley included the information Collins had provided in a written statement, which was initialed and signed by Collins and his mother in his presence at 10:20 a.m. The written statement also included the Miranda warnings that were given to Collins prior to his signing the statement. Sergeant Kelly acknowledged that Sergeant Wilkie was also present when Collins' statement was being typed, which meant that there were three police sergeants and a staff person present when Collins gave his statement. Collins started his statement at 9:58 a.m. and concluded it at 10:20 a.m.

Sergeant Kelly said that Collins' interview was "extremely cordial" and "rather short" because Collins was "forthright" regarding his involvement in the planning and execution of the robbery of the victim. He stated that he had grown up with Collins' mother and that she had been involved when Vance, Collins' brother, gave his statement to police about this offense a day or two earlier. Sergeant Kelley noted that Collins was two months away from turning eighteen years old at the time he gave his statement in this case.

Sergeant Kelly said that Collins mother was present during the interview because Collins was a juvenile. However, he said, "With juveniles, people under 18, we try to have a parent present, but it is not mandatory that a parent be present . . . when we take a statement from a juvenile." Sergeant Kelley said Collins and his mother were allowed to read the written statement before Collins initialed each page and signed the statement. After he signed the statement, Collins was placed back into the interview room, and Sergeant Kelly discussed with a prosecutor the contents of the Collins' statement and what action to take.

Sergeant Kelly admitted that he did not include in the written statement or his supplement Collins' detailed explanation of how he and the codefendants used the Text Free application to create a false cell phone number. He said that he had made contemporaneous written notes regarding the details surrounding Collins' use of the Text Free application but that his notes had been destroyed. Sergeant Kelly acknowledged that he was a "pretty tech savvy" officer, which allowed him to understand how the Text Free application created a false cell phone number. He added that Collins appeared pretty tech savvy as well, explaining that Collins knew about the Text Free application as well as "every other app[lication] that was on his phone at the time."

Dr. Marco Ross, the Deputy Chief Medical Examiner for Shelby County, testified that he performed the autopsy on the victim. He stated that the victim had been shot six times and that any one of the three shots to the victim's back could have caused the victim's death.

Following the conclusion of the proof, the jury convicted Collins of first degree felony murder, and the trial court imposed a sentence of life imprisonment.

## ANALYSIS

**I. Denial of Motion to Suppress.** Collins argues that the trial court erred in declining to suppress his statement to police. He claims that his statement should have been suppressed because the police lacked probable cause to arrest him, because he was denied the right to a prompt determination of probable cause, and because his statement was involuntary because of the coercive actions of the police.

Prior to trial, Collins filed a motion to suppress his statement to police on the basis that it was obtained in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 9 of the Tennessee Constitution. Initially, we note that a trial court's findings of fact at a suppression hearing are binding on an appellate court unless the evidence preponderates against them. State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

"Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. at 23; see Bell, 429 S.W.3d at 529. Despite the deference given to trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. State v. Montgomery, 462 S.W.3d 482, 486 (Tenn. 2015) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

**A. Lack of Probable Cause.** Collins argues that his confession should have been suppressed because he was arrested without probable cause. He claims that because Vance and Henderson were criminal informants, the police could not rely on the information provided by them unless (1) they had a basis of knowledge and (2) they were credible or their information was reliable. See State v. Bishop, 431 S.W.3d 22, 38 (Tenn. 2014); State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989). Collins argues that because neither Vance nor Henderson were shown to be credible or reliable under this second prong, the officers lacked probable cause to arrest him. He further contends that because his statement was taken shortly after his arrest with no intervening independent act of free will on his part that purged the taint of his unlawful arrest, his statement should have been suppressed as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 485-88 (1963).

At the suppression hearing, the trial court found that the two documents containing Collins' name that were found in Vance's car were sufficient to establish that Vance and Henderson's information was reliable. However, Collins claims the proof at trial failed to establish (1) the papers belonged to him, and (2) were in the car because he was at the crime scene. He argues that Sergeant Lundy was unable to testify that the Southwest Community College financial paperwork belonged to Collins and claims that two documents containing his name in Vance's car were insufficient to place him at the scene because they could have been left in Vance's car at any point in time.

Collins asserts that the police lacked probable cause to arrest him based on the statements of Vance and Henderson, who were criminal informants. "Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997) (internal quotation marks and citations omitted). The courts in Tennessee have

- 11 -

routinely distinguished between "citizen informants, or bystander witnesses, and criminal informants, or those from the criminal milieu." State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993) (internal quotations marks and citation omitted). When a person from the criminal milieu provides information that contributes to the arrest of an individual, a totality-of-the-circumstances analysis may be appropriate in determining whether probable cause exists to support the arrest. Compare State v. Tuttle, 515 S.W.3d 282, 307-08 (Tenn. 2017) (overruling Jacumin and adopting the Gates totality-of-the-circumstances analysis when determining whether an affidavit establishes probable cause for issuance of a search warrant), with State v. Echols, 382 S.W.3d 266, 279 (Tenn. 2012) (holding that when officer relies in part on information from an informant from the criminal milieu, then the State must show that this informant "(1) has a basis of knowledge and (2) is credible or his information is reliable"). In conducting this totality-of-the-circumstances analysis, an informant's "veracity," "reliability," and "basis of knowledge" remain highly relevant but should not be recognized as independent requirements to be rigidly applied in each case. See Tuttle, 515 S.W.3d at 303 (citing Illinois v. Gates, 462 U.S. 213, 230 (1983)). Circumstances surrounding the information given by an informant, such as independent police corroboration of this information or corroboration of several details of this information, may increase the reliability of the facts provided by the informant. State v. Simpson, 968 S.W.2d 776, 782 (Tenn. 1998).

When considering the reliability of the criminal informant in this case, the trial court recognized that although the information provided by Vance and Henderson was "not presumptively credible," the reliability of their information was established because they "were present and involved during the commission of the offense and any deficit in their credibility was outweighed by the[] consistency [of their statements] and the corroboration of the documents [referencing Collins that were found] in the vehicle." The evidence does not preponderate against the trial court's finding that Vance and Henderson provided reliable information that Collins committed the offense in this case, and we conclude, based on the totality of the circumstances, that probable cause existed to support Collins' arrest.

**B. Neutral and Detached Magistrate.** Collins also argues that his statement should have been suppressed because it was obtained in violation of his Fourth Amendment right to a prompt determination of probable cause following his warrantless arrest. He asserts that his detention was unreasonable because he was never taken before a magistrate until his appearance in juvenile court, and he asserts that this claim is supported by Sergeant Lundy's admission that he did not know whether Collins was ever taken before a magistrate for a probable cause determination. Collins maintains that the police took his statement before taking him before a magistrate in order to gather additional proof justifying his arrest and that his statement to police should have been suppressed as fruit of the poisonous tree.

- 12 -

"[T]he Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention." Gerstein v. Pugh, 420 U.S. 103, 126 (1975); see State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). When individuals are arrested without a warrant, they must be brought before a magistrate to "'seek a prompt judicial determination of probable cause.'" Bishop, 431 S.W.3d at 42 (quoting Gerstein, 420 U.S. at 125); see Tenn. R. Crim. P. 5(a)(1); Huddleston, 924 S.W.2d at 672 n.2 (Tenn. 1996). A delay of less than forty-eight hours is "presumptively reasonable"; however, when the delay exceeds forty-eight hours, the State must show that "'a bona fide emergency or other extraordinary circumstance' caused the delay." Bishop, 431 S.W.3d at 42 (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991)). Even a delay of less than forty-eight hours may be unreasonable "if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or if the delay is 'motivated by ill will against the arrested individual, or delay for delay's sake.'" Id. (quoting McLaughlin, 500 U.S. at 56).

The remedy for failing to bring a defendant before a magistrate without unnecessary delay is the exclusion of the evidence obtained as a result of the unlawful detention, unless an exception to the exclusionary rule applies. Id. (citing Huddleston, 924 S.W.2d at 673). Under the "'fruit of the poisonous tree' doctrine, . . . any evidence obtained by virtue of a suspect's unlawful detention must be excluded from trial unless the arrested person's statement was 'sufficiently an act of free will to purge the primary taint' of the illegal detention." Id. (quoting Huddleston, 924 S.W.2d at 674-75). When an arrest is supported by probable cause, the arrestee's "ensuing detention is typically not illegal until it 'ripens' into a Gerstein violation." Id. (quoting Huddleston, 924 S.W.2d at 675). Therefore, if an arrestee's statement "was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." Huddleston, 924 S.W.2d at 675.

The trial court made several findings of fact relative to this issue in its order denying the motion to suppress. It found that Collins was arrested without a warrant on the morning of March 12, 2014, and that at the time of his interview, Collins had not been charged with any crime. It also found that Collins was physically restrained during the interview and was not free to leave. Moreover, the trial court found that Collins signed an Advice of Rights form at 9:22 a.m. before being interviewed by Sergeants Kelly and Lundy, that Collins completed his written statement at 10:20 a.m., and that Collins signed the written statement at 10:30 a.m.. The trial court recognized that "[t]he record before this Court does not reflect any probable cause determination before the juvenile court hearing on April 23, 2014.

The trial court also made the following conclusions of law regarding this issue:

- 13 -

[T]he only remedy for an extended detention without a probable cause determination is suppression of statements made after the detention has extended beyond a constitutionally reasonable duration, which our courts have determined to be 48 hours. [Collins'] incriminating statements, both oral and written, were given on the same day as when he was originally detained. Even if [Collins] were unlawfully detained, a statement given only a few hours after the initial detention cannot be considered induced by the allegedly unlawful detention.

Accordingly, [Collins] is not entitled to suppression of his statements because of the duration of his detention prior to a probable cause determination.

The evidence does not preponderate against the findings of fact made by the trial court. We have already concluded that sufficient probable cause existed for police to believe that Collins committed the offense at the time he was arrested. Probable cause existed based on the statements from Vance and Henderson, the consistency of these statements, and the documents containing Collins' name and address that were inside Vance's car left at the crime scene. Because the police had probable cause to arrest Collins at the time he was taken into custody, Collins has failed to show that the delay in obtaining a probable cause determination by a magistrate was "'for the purpose of gathering additional evidence to justify the arrest.'" Id. at 676 (quoting McLaughlin, 500 U.S. at 56). Moreover, because Collins provided his statements to police before his detention ripened into a Gerstein violation, we also conclude that his statements were not the product of the illegal detention and, therefore, should not be suppressed.

C. **Voluntariness of Statement.** Collins next contends that his confession should have been suppressed because it was involuntary. He contends that his depressive disorder and dependent personality disorder prevented him from understand the warnings on the Advice of Rights form and caused him to sign the form in order to comply with the wishes of the interviewing police sergeants and his mother. Collins asserts that because his statement was taken to confirm what the police already thought they knew, the procedure was coercive, which rendered his statement involuntary.

The voluntariness of a confession "remains distinct from Miranda." State v. Climer, 400 S.W.3d 537, 567 (Tenn. 2013) (citing Dickerson v. United States, 530 U.S. at 428, 434-35 (2000)). Because "coerced confessions are inherently unreliable," only voluntary confessions are admissible. Id. In order for a statement to be voluntary, it "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State

- 14 -

v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

In determining the voluntariness of a confession, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." Climer, 400 S.W.3d at 568; see State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) ("The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment."). In making this determination, the court must examine the totality of the circumstances, including "'both the characteristics of the accused and the details of the interrogation.'" Climer, 400 S.W.3d at 568 (quoting Dickerson, 530 U.S. at 434). These circumstances include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

Huddleston, 924 S.W.2d at 671 (alteration in original) (emphasis omitted).

Collins asserts that his depressive disorder and dependent personality disorder prevented him from understanding the warnings on the Advice of Rights form and caused him to sign the form in order to comply with the wishes of the police and his mother. As to this issue, the trial court concluded that "although [Collins] may have been somewhat more impressionable than the average person of his age and gender, [Collins'] desire to comply with an authority figure was voluntary and based on [Collins'] beliefs about his own best interests rather than imposed externally by the will of the officers." In addition, the trial court held that "[a]lthough [Collins] may have felt compelled to incriminate himself because of his psychological condition, [Collins'] statements were not induced by coercive police activity that would violate [his] constitutional rights."

The evidence presented at the suppression hearing and at trial established that Collins, who was seventeen years old at the time he gave his statement to police, was accompanied by his mother and that Collins' statement was obtained within a few hours

of his arrest. During the interview, Collins and his mother were informed of his <u>Miranda</u> rights and were given the opportunity to ask questions before Collins signed a written waiver of these rights and provided his statement. Sergeant Lundy testified that Collins appeared to understand his <u>Miranda</u> rights and did not appear to have any learning disabilities. Collins' entire interview lasted a short period of time, approximately an hour and a half. Significantly, there was absolutely no evidence offered showing that the police threatened Collins or engaged in coercive acts during the interview in order to obtain his statement. Considering the totality of the circumstances, we agree with the trial court that any mental defects did not render Collins' statement involuntary.

**III. Admission of Certain Evidence.** Collins contends that the trial court erred in admitting several pieces of evidence at trial. "Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." <u>State v. Franklin</u>, 308 S.W.3d 799, 809 (Tenn. 2010) (citing <u>State v. Lewis</u>, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" <u>Lewis</u>, 235 S.W.3d at 141 (quoting <u>State v. Ruiz</u>, 204 S.W.3d 772, 778 (Tenn. 2006)).

However, the following standards govern appellate review of a trial court's rulings on hearsay evidence:

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. <u>State v. Gilley</u>, 297 S.W.3d at 760-61. Once the trial court has made its factual findings, the next questions— whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review. <u>State v. Schiefelbein</u>, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); <u>Keisling v. Keisling</u>, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

<u>Kendrick v. State</u>, 454 S.W.3d 450, 479 (Tenn. 2015).

- 16 -

**A.  Calls and Text Messages to Victim's Cell Phone.**  First, Collins argues that the trial court erred in declining to exclude Lee's testimony regarding text messages and phone calls that were made to the victim's cell phone just before his death.  He argues that the admission of this evidence violated Rule 901(b)(9) because no witness testified about the process cell phones use to produce accurate copies of messages or phone calls.  In addition, noting that neither the cell phone nor the messages or calls were admitted into evidence, Collins argues that Lee's testimony about this evidence, which did not specify whether she was referring to text messages or voice messages, violated Tennessee Rules of Evidence 1002.

Just prior to trial, Collins filed a motion in limine to exclude Lee's testimony about these text messages and phone calls.  At the hearing the morning of Collins' trial, the defense argued that Lee's testimony should be excluded under Tennessee Rules of Evidence 901 and 1002.  The defense noted that at Vance's earlier trial for this offense, Lee testified that on the night of the victim's death, she looked at the victim's cell phone and discovered that he had received some phone calls and text messages, the last of which was received around 11:00 p.m., about someone who was interesting in purchasing the victim's Mustang.  The defense expressed concern that Lee would testify not only to the content of these text messages and calls but also the date and time of these messages, which it claimed violated the "best evidence rule" set forth in Rule 1002.  The defense also argued that the State had failed to show that the times and dates of these text messages and calls were transmitted through a reliable process or system pursuant to Rule 901(b).  In response, the State explained that the victim's cell phone was not available because it had never been collected as evidence.  It also claimed that the best evidence rule applied to documents, not a time stamp on a cell phone.

In ruling on this issue, the trial court recognized that Lee would not be testifying about what these messages and calls said "word-for-word"; instead, her testimony would indicate that the person who sent these text messages and calls said he was interested in buying the victim's Mustang.  The trial court held that the defense could cross-examine Lee on this issue and that it did not believe the best evidence rule applied.  The court also held that because Collins admitted that he used the Text Free application to text the victim about the Mustang prior to the killing, it would allow Lee to testify that she viewed the content of those text messages as well as the time and date of the text messages and then gave this information to the police.  At trial, Lee testified that the victim's cell phone had text messages and phone calls between the victim and an unidentified person about the Mustang the victim was trying to sell.

Rule 901, which requires evidence to be authenticated or identified, provides, "The evidence of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that

the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). As an example, the rule provides that "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result" may be necessary to properly authenticate evidence. Tenn. R. Evid. 901(b)(9). In addition, Tennessee Rule of Evidence 1002, also known as the best evidence rule, states, "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided[.]"

We believe that Lee's testimony sufficiently established that she had ample knowledge of the victim's phone to identify the text messages and phone calls. See Tenn. R. Evid. 901(b)(1). We also recognize that the unavailability of the cell phone or the text messages in this case did not render testimony about the text messages and calls inadmissible under the best evidence rule set out in Rule 1002. "The best evidence rule is a rule of preference rather than exclusion." Iloube v. Cain, 397 S.W.3d 597, 602 (Tenn. Ct. App. 2012). "It does not exclude evidence but rather requires the introduction of the best available form of the evidence." Id. (internal quotation marks and citations omitted). The State made it clear that Lee's testimony, which was subject to cross-examination, was the best evidence available regarding the text messages and calls. Therefore, we conclude that the trial court did not abuse its discretion in admitting this testimony, especially in light of the other overwhelming proof of Collins' guilt that was presented at trial.

**B. Dionne Lee's Hearsay Testimony.** Collins also contends that the trial court erred in denying his motion to exclude Lee's testimony about statements made by witnesses at the scene. Collins asserts that this testimony should not have been admitted because Lee never identified the declarant and because the State presented no evidence as to whether the declarant actually observed the shooting or came along after the shooting. He also contends that Lee's testimony failed to show that the declarant appeared excited when making this statement and fell short of what is required by the excited utterance exception in Rule 803(2).

Collins filed a motion in limine to exclude Lee's testimony about a statement she heard from a witness just after victim's shooting. At the hearing on this motion, the defense reminded the trial court that at Vance's earlier trial on this offense, Lee testified that "a couple of people told her . . . a guy in a Mustang . . . shot another guy who was lying nearby on the ground." The defense asked the trial court to exclude this testimony in Collins' trial because it was hearsay, and the State countered that it did not believe the court could determine whether the declarant's statements were excited utterances or met some other hearsay exception until after it heard the proof. The trial court agreed, reserving judgment on that motion until it heard evidence regarding the circumstances surrounding the declarant's statement.

At trial, Lee testified that after hearing several gunshots, she went to the parking lot and noticed several people standing around, who appeared to be "in shock." When Lee testified that she asked these people what had happened, the defense objected on the ground of hearsay. The State argued that the excited utterance hearsay exception applied to this statement, and the trial court immediately overruled the objection. Lee then testified that one of these individuals told her "the guy in the Mustang shot that guy" and pointed in the direction of her apartment building, where the victim's body was located.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Under Tennessee Rule of Evidence 803(2), an "excited utterance" not excluded by the hearsay rule is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In order to meet the excited utterance exception, (1) a startling event or condition must occur that suspends the normal, reflective thought processes of the declarant, (2) the declarant's statement must relate to this startling event or condition, and (3) the declarant must make this statement while under the stress or excitement from the event or condition. Franklin, 308 S.W.3d at 823 (citing State v. Stout, 46 S.W.3d 689, 699 (Tenn. 2001), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 581-82 (Tenn. 2004); State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997)).

Here, the startling event was that the victim had just been shot, the declarants' statement was directly related to this startling event, and the statement was made while still under the stress of the shooting. Accordingly, under our de novo review, we conclude that Lee's testimony about these statements was admissible under the excited utterance exception to the hearsay rule. See Kendrick, 454 S.W.3d at 479.

**C.** **Temporary Tag and Juvenile Court Summons.** Lastly, Collins argues that the trial court erred in admitting evidence regarding a temporary license tag for Vance's Monto Carlo, which contained Brandon Vance's name and address of 3730 Fieldbrook Street, Memphis, Tennessee, and a juvenile summons, which contained Collins' name and this same address.[2] Collins claims the information on the temporary tag was inadmissible hearsay because it was offered to show that Vance owned the Monte Carlo and was, therefore, at the scene of the crime. He also claims the information on the juvenile summons was inadmissible hearsay because it was offered to prove that Collins, who had left the summons behind in Vance's car, was also at the crime scene. Collins

---

[2] Although the temporary tag and the juvenile summons, which were retained by the clerk's office, were not included in the record on appeal, the trial transcript provides sufficient information for us to determine this issue.

- 19 -

alternatively argues that the juvenile summons, which showed that Collins had committed multiple driving offenses, was inadmissible as proof of other crimes, wrongs, or acts under Rule 404(b).

Just before trial, Collins filed a motion in limine to exclude the temporary tag as hearsay. At the ensuing hearing, the defense argued that the State, at Vance's earlier trial for this offense, argued to the jury that the address on the temporary tag was Vance's home address, which was close to the location where the victim's Mustang had been recovered. The defense asserted that the temporary tag had been offered by the State in Vance's trial to prove the truth of the matter asserted, namely that the address on the tag was Vance's home address, and that if the State offered the tag for the same purpose in Collins' trial, it would again be inadmissible hearsay. The State replied that in Vance's trial the temporary tag had been admitted to show that the Monte Carlo belonged to Vance and that in Collins' trial, the temporary tag would be admitted not only to establish Vance's identity as one of the perpetrators but also to help the State to show that Collins, Vance's brother, was involved in the victim's death, especially in light of the fact that two documents containing Collins' name had been found inside the Monte Carlo and that Collins had told police that his home address was the same address as that listed on the tag. The trial court held that based on its own research, the tag was admissible as an exception to the hearsay rule and was a self-authenticating document.

In the same pre-trial hearing, the State also disclosed that it intended to offer a juvenile summons made out to Collins that was found in the Monte Carlo at the scene. The State acknowledged that the juvenile summons could raise a Rule 404(b) issue and said it planned to introduce it because it indicated that Collins was with Vance at the time the crime was committed.

During the Rule 404(b) hearing outside the presence of the jury, the State argued that it would be admitting the juvenile summons, not to show that Collins committed a moving violation, but as proof of his identity as a perpetrator and to establish that Collins and Vance had the same home address. The State also asserted that the juvenile summons, which placed Collins at the scene of the crime, corroborated Collins' statement to police. The defense responded that the juvenile summons was inadmissible pursuant to Tennessee Rule of Evidence 404(b) because the probative value of the evidence was outweighed by the danger of unfair prejudice. It claimed that the summons was prejudicial because it showed Collins had been charged with not having a driver's license, violation of the financial responsibility law, and violation of a traffic ordinance. The trial court, in holding that the juvenile summons was admissible, determined that the material issue other than conduct conforming with a character trait was the identity of Collins as a perpetrator of the felony murder. The court also held that the proof of the juvenile summons was clear and convincing and that probative value of this evidence,

which connected Collins to Vance's vehicle at the time of the offense, was not outweighed by the danger of unfair prejudice.

At trial, Sergeant Titus identified a photograph of the Monte Carlo with the temporary tag placed in its window. Later, during Sergeant Sewell's testimony, the temporary tag and the juvenile summons found inside the Monte Carlo were entered into evidence. Sergeant Sewell stated that the temporary tag listed Brandon Vance's name and an address of 3730 Fieldbrook Street, Memphis, and that the juvenile summons had been issued to Collins for a traffic ticket that contained the same address of 3730 Fieldbrook Street, Memphis.

After Sergeant Sewell's provided this testimony, the trial court immediately instructed the jury that if it found that Collins committed a crime or crimes other than that for which he was on trial, then it could "not consider such evidence to prove his disposition to commit such a crime as that on trial" and that the evidence could only be considered "for the limited purpose of determining whether it provides the defendant's identity." The court also instructed that "[s]uch evidence . . . must not be considered for any purpose other than that specifically stated." The trial court gave a similar instruction at the conclusion of proof at trial.

As we noted, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A written assertions is a "statement" under the hearsay rule. Tenn. R. Evid. 801(a); see Franklin, 308 S.W.3d at 811. The temporary tag contains a written statement, namely a name and address, and this written statement reflects that the temporary tag for the Monte Carlo had been issued to Vance, who lived at 3730 Fieldbrook Street, Memphis. See Franklin, 308 S.W.3d at 811. Based on the testimony provided, we conclude that the State offered the information on the temporary tag for its truth, namely that the tag for the Monte Carlo was issued to Vance, who lived at 3730 Fieldbrook Street, Memphis and was hearsay.

We must now determine whether this statement was admissible under the Tennessee Rules of Evidence. We believe that the temporary license tag could be considered a public record under Rule 803(8), which provides that the following information is not excluded by the hearsay rule:

> **Public Records and Reports.** Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, records, reports, statements, or data compilations in any form of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters

- 21 -

there was a duty to report, excluding, however, matters observed by police officers and other law enforcement personnel.

It also appears that the temporary license tag was self-authenticating under Rule 902(1), (7), or (10). Accordingly, we conclude that the trial court did not err in admitting the temporary tag.

As to Collins' claim that the juvenile summons was hearsay, we note that the defense has waived this issue by failing to make an objection on that ground at trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). Because Collins waived this issue, he is not entitled to relief on this claim.

Alternatively, Collins argues that the admission of the juvenile summons violated Rule 404(b). Evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character is inadmissible. See Tenn. R. Evid. 404(a). However, evidence of other crimes, wrongs, or bad acts may be admissible for other purposes if this evidence satisfies the conditions in Rule 404(b).

Rule 404(b) states:

**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Pursuant to the Advisory Commission Comment to Rule 404, "evidence of other crimes should usually be excluded." Tenn. R. Evid 404(b), Adv. Comm'n Cmt. However, in exceptional cases, "where another crime is arguably relevant to an issue other than the accused's character," such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," the evidence may be admissible. Id.; see State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (stating that evidence of other crimes, wrongs, or acts may be admissible if it establishes the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation).

If a trial court substantially complies with the requirements in Rule 404(b), the court's ruling will not be overturned absent an abuse of discretion. State v. Hawkins, 519 S.W.3d 1, 45 (Tenn. 2017). This court will find an abuse of discretion "only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga–Hamilton County Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

The record shows that the trial court substantially complied with Rule 404(b)'s procedural requirements. We agree with the trial court that the juvenile summons had substantial probative value because it helped establish Collins' identity as one of the perpetrators of the first degree felony murder. Although the juvenile summons was slightly prejudicial because it showed that Collins had been written a ticket for several misdemeanor driving offenses, its admission established that Collins was linked to the car and assisted the jury in determining whether Collins was guilty of the charged offense. For this reason, we conclude that the trial court did not abuse its discretion in admitting the juvenile summons at trial.

**III. Sufficiency of the Evidence.** Collins argues that the evidence is insufficient to sustain his conviction for first degree felony murder. Specifically, he contends that the proof in this case only supports a conviction for facilitation of robbery. See T.C.A. § 39-11-403(a) ("A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony."). Collins claims that the plan was for

- 23 -

Henderson to point the gun at the victim and take his keys, not shoot him, and that although he knowingly furnished substantial assistance to Henderson by providing him with a gun, he lacked the intent required for first degree felony murder under the theory of criminal responsibility.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). The culpable mental state required for a felony murder conviction is the intent to commit the underlying felony, namely robbery in this case. Id. § 39-13-202(b); see Wagner, 382 S.W.3d at 299. Robbery is an "intentional or knowing theft of property from the person

- 24 -

of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103.

Collins argues that the proof in this case only supported a conviction for facilitation of robbery. Therefore, we must determine whether the evidence supporting his conviction satisfies the felony murder rule. The felony murder rule applies when the killing is "'done in pursuance of the unlawful act, and not collateral to it.'" Banks, 271 S.W.3d at 140 (quoting Rice, 184 S.W.3d at 663). In other words, "'[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it.'" State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956)).

"A killing that precedes, coincides with, or follows the commission of an underlying felony will be considered 'in the perpetration of' the underlying felony, so long as there is a connection in time, place, and continuity of action." Wagner, 382 S.W.3d at 299 (citing State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000); State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). There should also be a causal connection between the killing and the underlying felony. Buggs, 995 S.W.3d at 106 (citing Farmer, 296 S.W.2d at 884; State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring this causal connection supports the deterrent effect of the felony murder rule by excluding killings that are "collateral to and separate from the underlying felony." Pierce, 23 S.W.3d at 296.

In a felony murder case, the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Buggs, 995 S.W.2d at 107. "[W]hether a defendant intended to commit the underlying felony, and at what point the intent existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances." Wagner, 382 S.W.3d at 300 (citing Buggs, 995 S.W.2d at 107). As applicable in this case, "a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Buggs, 995 S.W.2d at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

A defendant may be convicted of a crime as a principal actor or pursuant to the theory of criminal responsibility. An individual is criminally responsible for an offense committed by the conduct of another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the

person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). "[D]efendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had committed the crime themselves." State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008) (citing State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997)). In order to be convicted under a theory of criminal responsibility, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

The evidence, when viewed in the light most favorable to the prosecution, is sufficient to sustain Collins' conviction for first degree felony murder. The proof established that on March 9, 2014, Collins, Vance, and Henderson planned to rob the victim of his Ford Mustang. Given the proof presented at trial, a reasonable jury could have found that Collins had the intent to commit the robbery based on his own conduct or the conduct of Vance or Henderson, for which Collins was criminally responsible. Collins admitted that he planned to rob the victim, that he provided the gun used in the offense, that he actively participated in the robbery, and that he fled from the scene in the victim's Mustang after the victim was shot. Collins' statement to police was corroborated by the statements from Vance and Henderson, as well as the documents containing Collins' identifying information, which placed him in Vance's Monte Carlo prior to the offense. Because a rational jury could have inferred from this proof that Collins had the intent to commit the robbery prior to, or concurrent with, the killing of the victim, we conclude that the evidence is sufficient to sustain Collins' conviction.

**IV. <u>Sentencing of a Juvenile to Life Imprisonment.</u>** Finally, Collins argues that his sentence of life imprisonment violates the prohibition against cruel and unusual punishment in the United States and Tennessee Constitutions and that the trial court abused its discretion in failing to dismiss his indictment on that basis. See U.S. Const. amend. VIII; Tenn. Const. art. I, § 16. Noting the existence of shorter life sentences in other states, Collins contends that his punishment is disproportionate to the crime committed because he was a minor at the time of the offense and did not kill or intend to kill the victim in this case. See Graham v. Florida, 560 U.S. 48, 69 (2010) ("It follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability.").

Collins asserts that his sentence has the effect of a sentence of life without parole because statistics show that he will likely die in prison. He reiterates that he was seventeen years old at the time of the offense and was subsequently convicted as charged of first degree felony murder and sentenced to the minimum, mandatory sentence for this offense, which is life imprisonment. See T.C.A. § 39-13-202(c). Pursuant to Code sections 40-35-501(h)(1) and 40-35-501(i)(1), an individual must serve sixty years on a sentence of life imprisonment prior to being eligible for release. He notes that if such an individual receives all the available credits for good behavior, then that person is entitled to a fifteen percent reduction on the sentence, which equates to service of fifty-one years in prison. Id. § 40-35-501(i)(1); Vaughn v. State, 202 S.W.3d 106 (Tenn. 2006). Collins claims that if he is released on the earliest date possible, he will be sixty-eight years old, and that if he fails to earn any good conduct credits, he will be seventy-seven years old at the time of his release. Relying on statistics regarding the average life expectancy of incarcerated African-American males, Collins maintains that because he will spend his entire life in prison, he has, in effect, been sentenced to life without parole. As to this issue, we note that the United States Supreme Court has held that "while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life." Graham, 560 U.S. at 75.

Collins also argues that Tennessee's sentencing scheme for first degree murder, which prevents a trial court from sentencing a juvenile to anything less than life imprisonment, violates Miller v. Alabama, 567 U.S. 460 (2012), by not allowing the court to consider "the personal attributes that are peculiar to children." He argues that his sentence constitutes a cruel and unusual sentence because at the time he committed this offense at the age of seventeen, his character was not as well formed as an adult's character, his traits were less fixed, and his actions were less likely to be evidence of irretrievable depravity, assertions that he claims were supported by Dr. Walker's testimony. See id. at 471 (citing Roper v. Simmons, 543 U.S. 551, 570 (2005)). Collins essentially maintains that because the mandatory sentencing scheme in Tennessee precludes individualized sentencing for juveniles convicted of first degree murder, it violates Miller. See id. at 483. However, as we will explain, Miller only mandates individualized sentencing for juveniles sentenced to life without parole, not juveniles sentenced to life imprisonment.

On February 22, 2016, the defense filed a motion for dismissal of the indictment on the basis that Tennessee's sentencing scheme for juveniles convicted of first degree murder violated the prohibitions against cruel and unusual punishment under the United States and Tennessee Constitutions. In a hearing immediately prior to Collins' trial, the trial court noted, "[C]ase law has come down from the Appellate Courts [dealing] with that matter in the interim since that motion was filed. The defense responded that while

- 27 -

the Court of Criminal Appeals had filed an opinion addressing a similar argument regarding a different sentence, the Tennessee Supreme Court had not yet addressed the issue raised in Collins' motion to dismiss. The trial court, recognizing that it had denied a similar motion in Martiness Henderson's case, stated that it was also denying this motion in Collins' case.

In Miller, 567 U.S. at 479, the United States Supreme Court held that a mandatory sentence of life imprisonment without parole for juvenile offenders violates the Eighth Amendment's prohibition against cruel and unusual punishment. The Court concluded that while it did not bar the imposition of a sentence of life without parole for juvenile homicide defendants, it did require that "a sentencer follow a certain process— considering an offender's youth and attendant characteristics—before imposing a particular penalty." Id. at 483.

Later, this court echoed Miller by recognizing that juvenile defendants convicted of first degree murder may still be sentenced to life without parole. See Charles Everett Lowe-Kelley v. State, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *9 (Tenn. Crim. App. Feb. 24, 2016) (noting that "Miller did not hold that a juvenile can never be sentenced to life without the possibility of parole" before upholding the juvenile defendant's consecutive life sentences as constitutional), perm. app. denied (Tenn. June 23, 2016); Cedrick Dickerson v. State, No. W2013-01766-CCA-R3-PC, 2014 WL 3744454, at *5 (Tenn. Crim. App. July 28, 2014) (upholding a juvenile's sentence of life without parole because "the trial court provided the exact consideration that the Supreme Court called for in Miller"), perm. app. denied (Tenn. Nov. 19, 2014).

Moreover, this court has consistently rejected the claim that a juvenile's mandatory life sentence, which requires service of fifty-one years before release, constitutes an effective sentence of life without parole in violation of Miller. See Martez D. Matthews v. State, No. M2015-02422-CCA-R3-PC, 2016 WL 7395674, at *4 (Tenn. Crim. App. at Nashville, Dec. 21, 2016), perm. app. denied (Tenn. Apr. 13, 2017); Charles Everett Lowe-Kelley, 2016 WL 742180, at *8; Billy L. Grooms v. State, No. E2014-01228-CCA-R3-HC, 2015 WL 1396474, at *4 (Tenn. Crim. App. Mar. 25, 2015), perm. app. denied (Tenn. July 21, 2015), cert. denied, 136 S. Ct. 1216 (Feb. 29, 2016) State v. Kayln Marie Polochak, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *34 (Tenn. Crim. App. Jan. 16, 2015), perm. app. denied (Tenn. May 14, 2015); Cyntoia Denise Brown v. State, No. M2013-00825-CCA-R3-PC, 2014 WL 5780718, at *21 (Tenn. Crim. App. Nov. 6, 2014), perm. app. denied (Tenn. May 15, 2015); Floyd Lee Perry, Jr. v. State, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *5 (Tenn. Crim. App. Apr. 7, 2014), perm. app. denied (Tenn. Sept. 18, 2014); Charles Damien Darden v. State, No. M2013-01328-CCA-R3-PC, 2014 WL 992097, at *11 (Tenn. Crim.

App. Mar. 13, 2014), perm. app. denied (Tenn. Sept. 18, 2014). As the concurring opinion in Zachary Everett Davis recently explained, though:

> [A]lthough Tennessee's sentencing scheme allows for possible release of a defendant convicted of first degree murder after the service of fifty-one years, it is only in the rare instance, if ever, that a juvenile so sentenced would be released back into society. Even if the judge or jury decides that the features of the juvenile or the circumstances of the homicide require a sentence other than life without parole, the effect of the sentence is still the same. The juvenile has no meaningful opportunity for release whether you name the sentence imprisonment for life or imprisonment for life without the possibility of parole, and the juvenile will likely die in prison. "While the logical next step may be to extend protection to these types of sentences, this is not the precedent which now exists" in this State. Floyd Lee Perry, Jr., v. State, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *4 (Tenn. Crim. App. Apr. 7, 2014), perm. app. denied (Tenn. Sept. 18, 2014)].

No. M2016-01579-CCA-R3-CD, 2017 WL 6329868, at *26 (Thomas, J., concurring). Because the sentence in this case is not the functional equivalent of a sentence of life imprisonment without parole, Collins is not entitled to relief.

Finally, we address Collins' claim that his sentence is disproportionate to the crime committed. When a defendant in a non-capital case makes a proportionality challenge, this court must determine, as a threshold question, whether a comparison of the sentence to the offense committed "leads to an inference of gross disproportionality." State v. Harris, 844 S.W.2d 601, 603 (Tenn. 1992). In making this determination, we can assuredly conclude that a comparison of the sentence in this case to Collins' crime does not lead to an inference of gross disproportionality. Accordingly, we conclude he is not entitled to relief.

## CONCLUSION

Based upon the aforementioned authorities and reasoning, the judgment of the trial court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

- 29 -